Foster **HARDY**, Plaintiff,

v.

**UNITED STATES of America,**
Defendant and Third-Party
Plaintiff,

v.

**RYAN STEVEDORING COMPANY, Inc.,**
Third-Party Defendant.

Civ. A. No. 1291–A.

United States District Court,
E. D. North Carolina,
Wilmington Division.

Jan. 8, 1970.

also noted the broad discretionary power of a court to withhold declaratory relief.

A. A. Canoutas, Wilmington, N. C., for plaintiff.

Warren H. Coolidge, U. S. Atty., John R. Whitley, Asst. U. S. Atty., Raleigh, N. C., Alfred H. O. Boudreau, Jr., Department of Justice, Washington, D. C., for the United States.

Daniel L. Brawley, Wilmington, N. C., for Ryan Stevedoring Co.

## MEMORANDUM OPINION

OREN R. LEWIS, District Judge-Designate.

Foster Hardy, a ship's carpenter working for the Ryan Stevedoring Company, Inc., was injured while removing a pontoon from the number two hatch of a government-owned ship.

This suit against the Government alleging negligence and unseaworthiness followed—Ryan Stevedoring Company was made a third-party defendant—Both actions were heard by the Court without the aid of a jury. The Court's findings and conclusions follow.

On Friday, July 7, 1967, the USNS GAMMON, a government-owned ship,

moored at the Military Ocean Terminal at Southport, South Carolina. She was immediately inspected by government personnel and found to be in excellent condition to load cargo (ammunition).

The loading work was done by the Ryan Stevedoring Company, Inc., pursuant to its contract with the Government. Ryan's responsibilities included, among other things, maintaining all work areas in a reasonably clean condition. Ryan's workmen began loading ammunition July 7th. The number two hatch area was used during the three days preceding the date of the plaintiff's accident.

On the morning of July 11, 1967 the plaintiff Hardy, Shepard and a winchman were ordered by Ryan's hatch boss to open the number two hatch. They came aboard the GAMMON at eight o'clock. Hardy and Shepard placed wooden strips on the deck, rolled back the canvas covers and attached wires to the pontoons so they could be winched to the deck. Hardy and Shepard aided in positioning the pontoons by pulling and tugging on the guide wires.

By 8:30 a. m., Hardy and Shepard had stowed one pontoon on the deck and were positioning another when the swinging pontoon jerked and lurched, causing Hardy to slip and fall on his shoulder.

Shepard helped Hardy up. Hardy went to the office and reported the accident. He was told by the doctor that he had a pulled muscle which would require time to heal. He then went back on deck and saw grease and water on the deck where he had slipped—He had not noticed it before the accident. By the time Hardy got back on deck, the area where he fell had been sanded.

Shepard noticed the oil or grease on the deck where Hardy fell—He saw Scott—Ryan's superintendent—approaching from the aft end of the ship. He called him and pointed out the oil and water where Hardy had fallen. He says Scott stopped further work and ordered a dock driver to bring sand—Both he and Scott helped spread the sand.

No one from the Government or the Stevedoring Company supervised the opening of the hatch or the positioning of the pontoons. No one was present when Hardy slipped and fell except Hardy, Shepard and the winchman—The winchman did not testify.

Webb, Ryan's hatch foreman, went to the scene after the accident. He immediately reported it to Scott. He made no inspection of the deck and remembers only that the deck was wet.

Webb usually assigned from two to four men, and a winchman, to open the number two hatch. He did not recall why he assigned only two men on this date. The contract then did not require any specific number of men for this type of work—just what was necessary.

Scott, Ryan's superintendent, boarded the ship two or three minutes before the workmen did—He said he looked at the rigging and at the deck in the vicinity of the number two hatch—He saw no oil or grease on the deck.

Scott went to the scene immediately after the accident—He did not see any oil or grease on the deck—He had no recollection of putting sand on the deck. When pressed by government counsel and the Court, he said he did not put sand on the deck.

Scott personally made out and signed the accident report. It reads: Time of accident, 8:30 a. m. 7-11-67. How accident occurred—opening number two hatch—had—hold—rope—attached—to—pontoon—and slipped and fell on—right—shoulder. The accident was not reported to the Master of the ship and was not mentioned in the ship's log. A copy of Scott's report was later found in the files of the Department of the Army.

Hardy was sent back to work on the GAMMON shortly after the accident. His shoulder started to swell two or three days later and he again went to the doctor. He was then told he had a

torn ligament and would probably need surgery. He was referred to a surgeon on September 30th. The diagnosis then was rotator cuff tear of the right shoulder. He did not respond to conservative treatment and was operated on December 19, 1967. Maximum improvement was reached in June of 1968.

Hardy suffered a five per cent partial permanent impairment of his right arm as a result of the fall and subsequent surgery. This did not prohibit him from continuing to do longshoreman's work.

The accident was reported to Ryan's compensation carrier July 17, 1967. Hospital and doctor bills totaled $840.20. Disability payments totaled $2,672.00. Hardy was then earning $120.00 per week. He was unable to work for about six months, part of which was caused by a longshoremen's strike on the east side of the river.

■ On this record the Court finds that the USNS GAMMON was unseaworthy due to oil and/or grease and water (heavy dew) on the deck where the pontoons were being stowed and that such unseaworthiness was a proximate cause of the plaintiff's injuries.

■ A vessel owner (in this case the United States) is liable to indemnify a seaman or a shore-based harbor worker for personal injuries proximately caused by the unseaworthiness of the vessel— This duty to provide a seaworthy vessel has been called absolute and nondelegable. See, Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). The standard is not perfection but reasonable fitness—A longshoreman is entitled to a deck that is not unreasonably slippery. See Colon v. Trinidad Corporation, 188 F.Supp. 97 (S.D.N.Y. 1960).

Fair and reasonable compensation for the plaintiff's injuries and losses totals $15,000.00.

■ Hardy admits that he did not notice the oil or grease on the deck until after he had slipped and fallen. A longshoreman is duty bound to carry out his duties in a careful and prudent manner. See Hebert v. D/S OVE SKOU, 232 F. Supp. 277 (E.D.Texas 1964). He knew or should have known that he needed good footing to position the heavy pontoons.

Hardy further admits he did not check the deck to see if it was slippery before beginning work. His failure to look and to take such safety measures as were reasonably necessary constituted negligence on his part. Contributory negligence, however, in a maritime action such as this does not constitute an absolute defense—The doctrine of comparative negligence or proportionate fault applies. See Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L. Ed. 143 (1953).

The evidence in this case discloses that the steel deck of the GAMMON had been freshly painted—that there was a heavy dew on the morning of July 11th and that the slick spot found where Hardy was injured was relatively small. Even so, Hardy should have looked before he started to tug on the guide line. His judgment will be reduced twenty per cent.

On payment of the judgment, Hardy will be required to repay the compensation carrier for the disability benefits received.

■ The third-party defendant impliedly and by contract warranted workmanlike services. See Ryan Stevedoring Company, Inc. v. Pan Atlantic SS Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). Ryan in this case failed to furnish such services. The company had the duty of reasonably inspecting the working area of the ship before the men were put aboard—Scott's two- or three-minute inspection at best was cursory— far from being reasonable.

■ The company further had the duty of furnishing adequate supervision while the work was being performed. No supervisory or hatch boss was near the number two hatch when Hardy and Shepard were ordered to open it. None was near when the accident occurred.

Such negligence on the part of Ryan, standing alone, is enough to entitle the Government to indemnity.

Ryan seems to take the position that the failure of Hardy to establish the source of the oil or grease relieves it from liability. Ryan speculates that the oil or grease, if it was there, had to come from the winch; that the winch was under government control and hence there was no liability on its part.

The question here for determination is not where the slippery substance came from but whether Ryan by the exercise of due diligence could have discovered its presence—Had Ryan made an adequate inspection of the ship and furnished adequate supervision of the work, it could have been discovered.

For the latest Fourth Circuit case on indemnity, see Frasca v. S/S Safina E. Ismail, 413 F.2d 259 (1969).

■ Having found that Ryan breached its warranty, the Government is entitled to recover its reasonable attorney fees and other expenses of litigation even though the ship was found to be unseaworthy. See the Fourth Circuit's decisions in Old Dominion Stevedoring Corporation v. Polskie Linie Oceaniczne, 386 F.2d 193 (1967); Calmar Steamship Corporation v. Nacirema Operating Company, 266 F.2d 79 (1959), and American Export Lines v. Norfolk Shipbuilding & Drydock Corporation, 336 F.2d 525 (1964).

■ The right to indemnity is not limited to the amount of the judgment but also includes attorney fees, costs and expenses. Holley v. SS The Manfred Stansfield, 186 F.Supp. 805 (this Court 1960).

The Government should file its itemized claim for attorney fees and other costs of this litigation within the next thirty days. If the parties cannot agree on the amount of legal fees and costs to be awarded, within fifteen days thereafter the Court will then fix a date for the taking of the necessary proof.

The Government will be awarded judgment against the Ryan Stevedoring Company, Inc. for the net amount awarded the plaintiff plus its reasonable attorney fees and other costs of this litigation, with interest from the date of the judgment.

Counsel for the Government should prepare an appropriate judgment order in accordance with this memorandum opinion, submit the same to counsel for the plaintiff and counsel for the third-party defendant for approval as to form, and then to the Court for entry.

The Clerk will send copies of this memorandum opinion to all counsel of record.